## ANNIE W. SIMPSON *vs.* CHRISTOPHER C. POST.

The petitioner sought to set aside for fraud a mortgage made by her to the respondent for money advanced to her husband to enable him to take stock in a manufacturing company, the alleged fraud consisting in extravagant and unwarranted representations with regard to the expected profits of the business made by the respondent, and in assurances that she would incur no risk in giving the mortgage. It appeared however that the respondent took an equal amount of the stock, that her husband also urged her to make the mortgage, and that the stock was for a considerable time worth much more than the

amount paid. The court below found the facts of the transaction, but did not find actual fraud on the part of the respondent. Held that the facts did not constitute a case of legal or constructive fraud, and that without the existence of actual fraud the petitioner was not entitled to the relief sought.

The petitioner's husband being in embarassed circumstances, the stock taken by him was issued in her name. Held that, as she might have disposed of the stock for more than enough to pay the mortgage debt, it did not appear that she had sustained any necessary damage by the fraud, even if it had existed.

BILL IN EQUITY to set aside a mortgage; brought to the Superior Court in Fairfield County. The petitioner alleged fraud on the part of the respondent in procuring her to execute the mortgage; the respondent in his answer denied the fraud, and by a cross-bill asked for a foreclosure of the mortgage. The court found the following facts :—

Previously to March, 1868, a corporation by the name of the Bridgeport Rubber Company had existed and done business in the city of Bridgeport; the respondent and E. L. Simpson, husband of the petitioner, being largely interested as stockholders in the company. In February, 1868, the company was substantially bankrupt; its whole assets being its machinery and certain patents regarded as valuable in the manufacture of India-rubber goods and which had formerly been the property of Simpson, and its liabilities being $24,000. The company appointed the respondent, said Simpson and Henry T. Blake, a committee with full authority to dispose of the machinery and patents for the sum of $24,000.

The respondent, and his brother J. W. Post, and Simpson, then agreed with each other that each should advance the sum of $8,000 for the purchase of the machinery and patents; that a new company should be formed to be called the Odorless Rubber Company, with a capital of $125,000, into which the machinery and patents should be put for $90,000; that the balance of the capital, $35,000, should be raised in cash as a working capital; and that out of the $90,000, $20,000 in paid up stock should be issued to each of them and the remaining $30,000 be used as should be agreed upon; and they authorized J. W. Post to purchase the machinery and patents, and the respondent and J. W. Post each paid the sum of $8,000, and subsequently the respondent advanced

the sum of $8,000 for Simpson. To secure the payment of the $8,000 thus advanced the note and mortgage in controversy were made by Simpson and the petitioner, the real estate mortgaged being her property. J. W. Post purchased of the committee the machinery and patents, the machinery being worth about $7,000, and in March, 1868, the Odorless Rubber Company was organized, and the machinery and patents were put into it as a part of its capital at $90,000. The whole of the $24,000 so advanced by the respondent, his brother and Simpson, was used to purchase the machinery and patents, and paid to the Bridgeport Rubber Company, which last company used the same to pay its debts, among which was one due to the respondent of $5,000.

At that time Simpson was in an embarrassed situation financially, and neither he nor the respondent would have gone into this operation unless from a desire to retrieve their losses as stockholders in the Bridgeport Rubber Company.

The petitioner was at that time the owner in fee in her own right of the premises embraced in the mortgage deed in question, and for a long time she hesitated about signing the mortgage deed. The respondent and his brother J. W. Post were, on several occasions before she signed the mortgage, at the house of Simpson, and were talking with him in the presence of the petitioner with reference to the company and its prospects. They said to her that one Fuller was to put in $10,000, and had put it in in cash, as a part of the working capital of the company; also that without doubt the company would be a success; that they would all be in the same boat together and would share equally in the profits; that Simpson ran no risk, as in a few months there would be good profits. They also said in her presence that there was no danger in her signing the mortgage.

The petitioner was in part induced by these statements to sign the mortgage. Her husband, when neither the respondent nor his brother was present, also strongly urged her to sign the mortgage and repeated to her the representations of the respondent; and the petitioner was also influenced thereby to execute the mortgage.

Neither the respondent, nor his brother J. W. Post, were practically acquainted with the manufacture of rubber goods in which the Odorless Rubber Company was to be engaged, but Simpson, who is now deceased, had been always engaged in the manufacture of such goods. All three were very sanguine that the new company was to be very successful, and upon one occasion, when the respondent was present, Simpson and one Chaffee, who was to take some of the stock, made a statement of the anticipated profits of the company, which was reduced to writing by J. W. Post and left by him with Simpson, before the execution of the mortgage by the petitioner, which statement was seen by the petitioner, and operated to induce her to sign the mortgage. The statement was as follows :

" The Odorless Rubber Company propose to manufacture the following articles :—1st. Carriage Cloth, Horse Covers, Piano Covers—this last to embrace all the different shades of flocked cloth. 2d. Patent Hose—embracing two patents. 3d. Clothing—both plain and flocked, and free from all smell of sulphur; four patents. 4th. Boots and shoes—entirely free from smell. 5th. Rubber Cushions—for horses' feet. 6th. Rubber Knobs—for trunks; will sell. 7th. Rubber Gum—for dental use, free from smell.

" The Carriage Cloth made of odorless rubber is a staple article, and will readily sell; one party agrees to take 1,000 yds. per week regularly. The profits on that amount are about 50 cts. per yard, or $500 per week and $25,000 per annum.

" The Hose to be made under two patents, has advantages which will command the trade ; it is estimated one million of feet are sold annually. This hose is stronger, of less weight, and cheaper, and will sustain 100 lbs. to the square inch more than any other. Its weight is about 4 oz. to the foot, while the ordinary hose weighs 32 oz. to the foot. We are preparing to manufacture 200 feet per day, on which there will be $1 per foot profit—$200 per day, and per annum (half to patentee) $30,000. A party from Chicago offers us an order for that city for 5,000 feet; profit $5,000. This hose

has been thoroughly tested at Providence and Bridgeport, and sustains 100 lbs. more than leather or rubber, according to report, as proved by actual experiment. An order from Com. Smith is promised for the U. S. Navy, for $25,000, profit $12,500.

· " The Clothing will be much superior to any other in market, and will pay a profit of 25 per cent., say $15,000. The company can make without any increase of capital 500 pairs of boots and shoes per day—say 20 per cent. profit, $100 per day for six months in the year, $25,000.

" We are offered 7000 pairs of Rubber Cushions for horses, per week, to be made at a profit per week of $2,500, per annum $12,500.

" We have an order from responsible parties for 40,000 Rubber Knobs for trunks; at 4 cents each, profit, $1,600.

" We are offered a royalty of $2 per pound for manufacturing the Odorless Dental Gum. It is estimated that 100,000 pounds are used per annum; say we manufacture 10,000 lbs., profits $20,000.

" Whole profits $129,000. Deduct half for drawbacks, and the profit will be $64,550 : which is about 50 per cent. on $125,000 capital."

None of the profits stated were realized.

On the 30th day of May, 1868, the petitioner executed the mortgage in question and delivered the same to the respondent. After the organization of the Odorless Rubber Company, $20,000 in stock was issued to the respondent and the same amount to J. W. Post, and $20,000 was issued in the name of the petitioner and to her, at the request of her husband, who was then financially embarrassed and unable to hold it in his own name, and also to protect it, as she was informed by him and led to believe, from a certain false claim preferred against him by one Stevens. The whole of the $20,000 of stock remained in her name on the books of the company until she subsequently transferred it from time to time, when and as her husband requested, and some of it, but how much did not appear, for the purchase of groceries and other sup·plies for the support of her family, which consisted of herself

and husband. From the organization of the Odorless Rubber Company down to the spring of 1872, its stock was worth par and was sold for that.

The balance of the $90,000, namely, the sum of $30,000, was in all respects disposed of as the parties had originally agreed it should be.

Fuller, before mentioned, in the month of April, 1868, subscribed for $10,000 of the cash working capital, and then paid in to the company $2,000 in cash. Afterwards the respondent purchased from him his stock of $8,000, not paid for, and paid into the company the full amount due for the same in cash. The whole amount of the cash working capital, namely, the sum of $35,000, was subscribed for and paid in cash into the company.

Prior to the spring of 1872 the petitioner had transferred from her name all of the stock standing in her name, and before the company had become embarrassed, but entirely without any personal benefit to herself or her property, and wholly as requested from time to time by her husband. At the date of the present petition the company had become and had since remained utterly bankrupt and insolvent.

The respondent once, before the execution of the mortgage, said to Mr. Fuller in the presence of the petitioner, that there were no debts owed by the company; he also said to the petitioner that the money raised and secured by the mortgage was not to be used to pay debts. She understood from these remarks of the respondent that the proceeds of the mortgage were to go into the treasury of the company, and was thereby, in connection with the other matters before stated, induced to execute the mortgage. The proceeds were used in the manner and for the purpose before stated, and in no other way went into the treasury of the company.

The interest was paid on the mortgage debt to October 1st, 1869, by Simpson in stock of the company at par. Since his decease the interest has been paid by the petitioner up to December 1st, 1871, and also $480 on the principal. The mortgaged premises are worth $20,000, incumbered by a previous mortgage for $10,000.

Upon these facts the case was reserved for the advice of this court.

*G. H. Hollister* and *Sanford*, with whom was *Slade*, for the petitioner.

*Treat* and *Bullock*, for the respondent.

CARPENTER, J. The petitioner alleges, in substance, that she was induced to sign the mortgage deed by the fraud and deceit of the respondent. The court below has not found fraud, neither expressly nor by implication. The court has found that the respondent and others made certain statements, and expressed opinions, which induced the petitioner to sign the deed. It does not appear however that the statements of fact were untrue; on the contrary it seems that most of them were substantially true. But whether true or otherwise, there is no finding that they were made with an intent to deceive or mislead. So also in respect to the opinions. In the main they were correct. If erroneous, it may have been because of mistakes in judgment. They were not necessarily fraudulent. Fraud in fact is not found, and the record does not present a case of legal or constructive fraud.

But even if it be conceded that fraud exists, it is not so clear that the petitioner has been or will be damaged thereby. The money loaned to her husband by the respondent yielded $20,000; a clear profit of one hundred and fifty per cent. As the stock in the new company, the product of the loan, stood in her name, it was in her power, with its avails, to have removed the incumbrance upon her real estate. Having neglected to do so, we are not satisfied that it is equitable for her to insist now that the respondent shall lose his just claim, simply because her expectations as to profits were not fully realized. The damage which the petitioner may sustain is not the direct, necessary, nor even probable, result of any fraud.

The Superior Court is therefore advised to deny the prayer of the petition, and to grant the prayer of the cross-bill.

In this opinion the other judges concurred.